ORDERED.

**Dated: March 01, 2021**

Roberta A. Colton
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re

John J. Phillips,                                              Case No. 8:17-bk-02415-RCT
                                                                   Chapter 7
         Debtor.

_____

New Falls Corporation,

         Plaintiff,                                    Adv. No. 8:18-ap-00483-RCT
v.

John J. Phillips,

         Defendant.

_____


**MEMORANDUM DECISION AND**
**ORDER DENYING DISCHARGE PURSUANT TO 11 U.S.C.**
**§ 727(a)(4)(A), SUSTAINING IN PART AND DENYING IN PART**
**OBJECTIONS TO EXEMPTIONS, AND DENYING MOTION FOR TURNOVER**

      Plaintiff New Falls Corporation ("New Falls") commenced this proceeding by filing a

seven-count complaint.[1]  New Falls asks the court to deny Defendant-Debtor John J. Phillips

("Debtor") his chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(4)(A)[2] (for false oaths or

---

[1] Doc. 1.
[2] Statutory references are to 11 U.S.C. §§ 101–1532 ("Code" or "Bankruptcy Code"), unless otherwise noted.

omissions), (a)(2) (for concealment of property), (a)(3) (for failure to keep or preserve records), (a)(5) (for failure to explain loss or deficiency of assets), and (a)(6)(A) (for failure to obey a lawful order of the court). New Falls further objects to Debtor's claimed exemptions and seeks turnover of any non-exempt property. Debtor answered the complaint and denied the material allegations.[3] Following a one-day trial the parties were instructed to submit written closing arguments. Having heard the testimony of Debtor, reviewed the exhibits proffered by New Falls,[4] considered the arguments of the parties, and being otherwise fully advised in the premises, the Court finds as follows.

## Introduction

Debtor is a self-described entrepreneur and salesman. In 1993 he started Southeast Print Programs, Inc. ("SE Print"), a direct-mail sales and printing company. SE Print primarily did business with Domino's Pizza franchises, providing them with printing and direct-mail services. In early 2013 Debtor bifurcated SE Print and sold the marketing/sales side of the company to his ex-son-in-law Sean Johnson. Mr. Johnson operated the split-off entity as Deliver Media, LLC while Debtor retained the printing side of the business.[5]

This proved to be a bad business decision for Debtor, and over the next few years SE Print became unprofitable as Deliver Media took its printing jobs elsewhere. The business failed and Debtor faced a mountain of guaranteed debt. As a result, Debtor was sued by his creditors from 2013 to 2016.[6]

New Falls is Debtor's largest creditor.[7] They are the successor in interest to Regions Bank. In late 2013, SE Print borrowed over $500,000 from Regions Bank, which Debtor personally

---

[3] Doc. 8.
[4] New Falls' Exs. 1–6, 16–23, 25, 27–30, 32, 35–37, 45–53, 60–72, 79, 81–82, 87–89, and 94 were admitted. Though not offered as exhibits, the Court takes judicial notice of the Debtor's section 341 meeting and continued section 341 meeting transcripts, Docs. 89 and 90 respectively.
[5] Doc. 65, New Falls' Exhibit List (hereafter "New Falls' Ex."), Ex. 20.
[6] New Falls' Exs. 16, 18, 19.
[7] New Falls' Ex. 17.

guaranteed.[8]  SE Print defaulted on its loan obligations and in October 2016 New Falls filed a state court complaint.[9]  In early March of 2017 New Falls obtained a Florida state court judgment against SE Print, Debtor, and Debtor's wife for $549,432.41.[10]  Shortly thereafter, Debtor filed for bankruptcy.

This proceeding arises because Debtor's bankruptcy schedules and statement of financial affairs, filed under oath, paint an inaccurate picture of his financial affairs.  A reader of Debtor's bankruptcy schedules and statements would be unaware of Debtor's extensive history of entrepreneurial ventures.  They would also be ignorant of Debtor's prior ownership interest in his now-employer BBI or that he created and transferred property to a revocable living trust in 2016 and 2017, including undisclosed commission payments.

**Facts and Background**

**Initial Disclosures**

Debtor filed his chapter 7 petition on March 24, 2017.[11]  About a month later, Debtor filed his Schedules A–J, Statement of Financial Affairs ("SOFA"), statement of current monthly income, and Official Form 106Dec attesting to the accuracy of his bankruptcy papers.[12]

Debtor scheduled four real properties on his Schedule A/B, all single-family homes.[13]  They were the Carrollbrook Property,[14] the Hiawatha Property,[15] the Centralia Property,[16] and the Richbarn Property.[17]  All but Debtor's homestead, the Carrollbrook Property, were underwater.[18]

---

[8] New Falls. Ex. 16 at 11–33.
[9] New Falls' Ex. 16.
[10] New Falls' Ex. 17 at 7–8.
[11] New Falls' Ex. 1.
[12] New Falls' Ex. 2.
[13] New Falls' Ex. 2 at 4–6.
[14] 10616 Carrollbrook Lane, Tampa, Florida 33618.
[15] 19944 Hiawatha Road, Odessa, Florida 33556.
[16] 14173 Centralia Road, Brooksville, Florida 34614.
[17] 26502 Richbarn Road, Brooksville, Florida 34601.
[18] New Falls' Ex. 2 at 13–15.

Debtor's only other scheduled assets were a 2004 Sundance boat valued at $2,000; a checking account with a balance of $1,000; a $900 utility prepayment, and $775 of personal and household items.[19]  Debtor's income, as disclosed on Schedule I, consisted of $2,600/month as "Director of Sales" of BBI Marketing.[20]  Debtor also reported $400/month in net rental income, though he did not list any leases or executory contracts on his Schedule G.[21]  On his statement of current monthly income Debtor represented receiving $1,300/month in rent against expenses of $900.[22]

On his Schedule J, Debtor did not include the mortgage payments or associated expenses of the Richbarn Property or the Hiawatha Property.[23]  Debtor listed $45,000 of unpaid tax debt to the IRS on his Schedule E/F along with 33 other unsecured creditors, many with claims of "unknown," including New Falls.[24]  On his Schedule D, Debtor identified Bonnie Brown as having a $12,000 lien on a 2008 BMW 750li (the "2008 BMW").  Debtor did not disclose any automobiles on his schedule A/B.[25]

In response to question 25 of Schedule A/B, which asks whether a debtor has "Trusts, equitable or future interests in property…, and rights or powers exercisable for your benefit," Debtor answered no.[26]  In response to question 19 of his SOFA, which addresses transfers of property to a "self-settled trust or similar device of which you are a beneficiary" within ten years of filing for bankruptcy, Debtor answered no.[27]  In response to question 27 of his SOFA, which

---

[19] New Falls' Ex. 2 at 6–8.
[20] New Falls' Ex. 2 at 31–32.
[21] New Falls' Ex. 2 at 29, 32, 45.
[22] New Falls' Ex. 2 at 45.
[23] New Falls; Ex. 2 at 33–34.
[24] New Falls' Ex. 2 at 16–27.
[25] New Falls' Ex. 2 at 13.
[26] New Falls' Ex. 2 at 8.
[27] New Falls' Ex. 2 at 40.

concerns ownership or connections to businesses within four years of filing for bankruptcy, Debtor

listed SE Print, but no other entities.[28]

**Section 341 Meeting of Creditors**

On May 11, 2017 Chapter 7 Trustee Beth Ann Scharrer (the "Chapter 7 Trustee") and U.S.

Trustee bankruptcy analyst Loring Daniel examined Debtor at his section 341 meeting.[29]  The focus

of the inquiry was on Debtor's real and personal property.  Debtor told the Chapter 7 Trustee his

estranged wife was living at the Centralia Property with her boyfriend, but a short-sale or

foreclosure was on the horizon.[30]  He also stated when he filled out his bankruptcy papers, he was

renting the Richbarn Property for $1,300/month but the house is now vacant because his soon-to-

be ex-wife is moving there.[31]

Debtor told the Chapter 7 Trustee that he rents the Hiawatha Property to Bonnie Brown, his

friend and employer at BBI for $1,500/month.[32]  Debtor explained he borrowed heavily against the

Hiawatha Property and the Centralia Property to fund the acquisition and operation of eight

Domino's Pizza franchises.  Debtor further explained he lost money on the transaction, and he

divested himself of his interest over two years ago.[33]  Debtor did not disclose this entity or the

divestiture on his sworn schedules.

Debtor testified that he drives the 2008 BMW listed on his Schedule D.[34]  He told the

Chapter 7 Trustee that SE Print previously owned the car, but he transferred the title "into my

children's trust" around the first of the year [2017].[35]  Debtor also stated that Bonnie Brown had a

---

[28] New Falls' Ex. 2 at 41–42.
[29] Doc. 89, Section 341 Meeting Transcript (hereafter "341 Tr.").
[30] 341 Tr. at 9:21–10:17.
[31] 341 Tr. at 19:3–20:14; 31:16–33:3.
[32] 341 Tr. at 8; 31:23–32:21.
[33] 341 Tr. at 8–12; 17.
[34] 341 Tr. at 20.
[35] 341 Tr. at 21:8–13; 23.

$12,000 lien on the 2008 BMW because she gave him money to pay delinquent property taxes on the Hiawatha Property.[36]

Debtor then explained he created the previously undisclosed trust in 2016,[37] and further disclosed transferring a 2004 F-250 with 170,000 miles to the Trust[38] that his wife drives (the "Truck").[39] The Truck previously was in SE Print's name. When asked if the Trust owns "any other property" Debtor said no.[40] The Chapter 7 Trustee asked for the payoffs on the real property, the title documents for the cars, and a copy of the Trust.[41]

On May 25, 2017 the Chapter 7 Trustee held a continued 341 meeting.[42] Many of the same topics were discussed. Debtor acknowledged there was furniture at the Centralia Property, but he and his wife had been separated for five years, and the deal was "this is yours. I need nothing here."[43] Debtor explained even though they were not formally divorced they had an informal settlement in place. Debtor clarified they were waiting to formalize their divorce until after selling the Centralia Property on the advice of their joint counsel, Robert Carr.[44] The Chapter 7 Trustee revisited the Trust and asked "[w]hat all is in the Phillips Family Trust?"[45] Debtor again identified just the 2008 BMW and the Truck.[46] The Chapter 7 Trustee was unsure if she had a copy of the Trust but asked Debtor to email it to her.[47] It is unclear if he ever did.

On July 26, 2017, the Chapter 7 Trustee filed her interim report, listing Debtor's real and personal property.[48] The Trust was not included in the report. On October 31, 2017 Debtor filed

---

[36] 341 Tr. at 21:23–22:7.
[37] 341 Tr. at 25.
[38] Defined *supra*.
[39] 341 Tr. at 24.
[40] 341 Tr. at 30.
[41] 341 Tr. at 27.
[42] Doc. 90, Continued Section 341 Meeting Transcript (hereafter "Cont. 341 Tr.").
[43] Cont. 341 Tr. at 15.
[44] Cont. 341 Tr. at 16.
[45] Cont. 341 Tr. at 12:12–13.
[46] Cont. 341 Tr. at 12–13.
[47] Cont. 341 Tr. at 12, 18.
[48] *In re John J. Phillips,* Case No. 8:17-bk-02415-RCT ("Main Case") Doc. 36.

an amended Schedule E/F, adding Deliver Media, LLC and Sean Johnson as creditors.[49]  On March

12, 2018 Debtor filed an additional amended Schedule E/F adding two more creditors.[50]

On April 24, 2018 the Chapter 7 Trustee filed a Report of No Distribution.  Per the report,

Debtor had exempt assets of $61,000– the $60,000 he claimed in his homestead, the Carrollbrook

Property, and $1,000 in personal property he claimed in the 2004 Sundance boat's engine. The

Chapter 7 Trustee abandoned the remaining $887,845.00 of Debtor's scheduled assets, which

included his four real properties and the rest of his scheduled personal property.  On June 15, 2018

New Falls conducted a Rule 2004 Examination of the Debtor.  On September 12, 2018 New Falls

conducted its Continued Rule 2004 Examination of the Debtor.  On June 12, 2019, Debtor filed an

amended Schedule A/B, listing a 2.5% interest in Call M.D. Plus, Inc. ("Call M.D.") with an

unknown value.[51]

**Debtor's Non-disclosures**

At trial, New Falls produced evidence and elicited testimony from Debtor regarding the

following nondisclosures or inaccurate disclosures on his bankruptcy papers.

**(a) The Trust**

The Debtor did not disclose the existence of the Phillips Living Family Trust (the "Trust"),

its bank account, or transfers he made or caused to be made to the Trust on his bankruptcy schedules.

Debtor formed the Trust in March 2016, about a year before he filed for bankruptcy, when

admittedly he could not pay his expenses as they came due.[52]  Per its terms, the Trust is a "revocable

living trust that contains [Debtor's] instructions for [his] own well-being and that of [his] loved

---

[49] Main Case Doc. 45.
[50] Main Case Doc. 59.
[51] Main Case Doc. 91.
[52] New Falls' Ex. 23; Doc. 83, Trial Transcript (hereafter "Trial Tr.") at 35:10–16.

ones."[53]   It is a self-settled trust and during his life Debtor has "the express and total power to control and direct payments, add or remove trust property, and amend or revoke" the Trust.[54]

The Trust was established by attorney Robert Carr, a longtime friend of the Debtor who also handled Debtor's divorce and various other legal matters, who has since been disbarred.[55]   No doubt the Trust was established by Mr. Carr as an asset protection device to insulate Debtor from pending lawsuits.   As discussed below, it was not the first such "asset protection" device employed by Mr. Carr.

Debtor used Trust funds to pay for, among other things, the gas and maintenance for the 2008 BMW,[56] expenses for his children,[57] two loans to himself,[58] the mortgage on the Richbarn Property,[59] the mortgage on the Carrollbrook Property, and the retainer for his bankruptcy lawyer.[60]

At trial, Debtor testified he thought the Trust was a separate entity and it did not have to be listed on his schedules.[61]   He did not bother to ask for clarification because he "… was just wanting to get this thing filed and get it over with."[62]

Debtor explained, notwithstanding his failure to include the Trust on his bankruptcy papers, he "disclosed the [T]rust to the Trustee … I made that mistake and, you know, I owned it.  I didn't realize that I had to do that.  I didn't understand, you know, that requirement."[63]

When asked by New Falls' counsel why he did not amend his bankruptcy papers to reflect the existence of the Trust or transfers made to the Trust, Debtor noted, "… I'm not really sure why.

---

[53] New Falls' Ex. 23 at 6.
[54] *Id.* at 12.
[55] Trial Tr. at 47:5–13.
[56] New Falls' Ex. 89.
[57] Trial Tr. at 60:4–8.
[58] Trial Tr. at 176:2–12.
[59] New Falls' Ex. 87.
[60] New Falls' Ex. 88.
[61] Trial Tr. at 254:2–20.
[62] Trial Tr. at 255–256.
[63] Trial Tr. at 52:11–14.

I mean, we have given you all the paperwork on it, so we weren't hiding it from you in any way at all …"[64]

**(b) Transfers to the Trust**

 **(i) Vehicles**

  On December 30, 2016, Debtor titled the two cars formerly in the name of SE Print to the Trust– the 2008 BMW and the Truck.[65]  Debtor did not disclose the vehicles on his Schedule A/B or the transfer of them to his Trust.  At the time of the transfer, SE Print owed hundreds of thousands of dollars of unpaid debt to creditors.[66]

  Debtor explained "…the rationale was that car[s] [were] in the name of S[E] Print. S[E] Print was a defunct company, and so the only reason I transferred the title was because all the information that was on the title was wrong, and so it seemed that the [T]rust was the logical place to put it."[67]  With respect to the Truck, which was in his wife's possession, Debtor explained, "I didn't feel I had to list it. It wasn't my truck. I didn't have the truck; I never drove the truck. The truck's a 2004. It's got, I think 180,000 miles on it. It's her truck."[68]

 **(ii) BBI Commission Payments**

  At some point in 2016 Debtor entered into a verbal agreement with BBI to be paid a weekly commission based on the number of pieces of direct mail BBI sent out.  Debtor instructed BBI to make the payments payable to the Trust.[69]  Debtor received his first commission payment on January 12, 2017, and received ten more payments pre-petition, for a sum of $13,727.42.[70]  Debtor

---

[64] Trial Tr. at 54:24–55:2.
[65] New Falls' Exs. 25, 26.
[66] Trial Tr. 58:19–24.
[67] Trial Tr. at 58:13–18.
[68] Trial Tr. at 70:5–8.
[69] Trial Tr. at 115:15–18.
[70] New Falls' Ex. 69.

deposited ten of the checks in the Trust's checking account,[71] and one check into his personal checking account.[72]

Debtor confirmed that he did not include these commission payments on his Schedule I or anywhere else on his bankruptcy papers.[73]  Debtor stated he did not disclose the checks because they were paid to a separate entity, the Trust.[74]

Notwithstanding Debtor's omission of the payments from his bankruptcy papers, Debtor included $2,200/month in commission income on his Family Law Financial Affidavit which he submitted to state court for his divorce.[75]  Debtor signed the affidavit about a month after filing his schedules.  Debtor reported gross income of $5,100/month on the affidavit while he reported just $3,000/month on his bankruptcy papers.

### (iii) Energy Textiles, LLC

In the latter half of 2016, Debtor transferred his 50% membership interest in Energy Textiles, LLC to the Trust.[76]  Debtor did not disclose his interest in Energy Textiles or its transfer on his bankruptcy papers.  Debtor formed Energy Textiles with Susan Wozniak in 2015.  It is a two-person company that makes apparel out of fabric with infrared properties.  Debtor explained Energy Textiles only had one "decent" client, Hammacher Schlemmer.[77]  Energy Textile's tax returns showed ordinary business income of $9,144 in 2015, $579 in 2016, $47,257 in 2017, and a loss of $73,493 in 2018.[78]

---

[71] The sum of the ten checks is $12,759.60. Debtor opened the Trust's checking account on January 13, 2017, two-and-a-half months before filing for bankruptcy. New Falls' Ex. 72.

[72] New Falls' Ex. 70 at 6.

[73] Trial Tr. at 131:21–132:1.

[74] Trial Tr. at 132:19–20.

[75] New Falls' Ex. 29 at 2; Trial Tr. at 131:14–20.

[76] Trial Tr. at 85:14–17.

[77] Trial Tr. at 220:22–24.

[78] Exs. 49–52.

Debtor acknowledged handling the day-to-day operations, which he noted were limited, and served as the designated representative of the company at its Rule 7030 examination.[79] Notwithstanding the above, Debtor testified that when he filed for bankruptcy the company was not on his radar.

**(c) BBI Ownership Interest and Transfer**

Debtor gave up his 49% interest in his present employer BBI for no consideration sometime after late-March 2015 despite indicating he did not "sell, trade, or otherwise transfer any property to anyone" within two years before he filed for bankruptcy on question 19 of his SOFA.[80] Similarly, Debtor did not disclose his former interest in the company on question 27 of his SOFA. Pursuant to a personal financial statement Debtor provided Regions Bank, Debtor still held his interest in BBI as of March 25, 2015.[81]

Shortly after giving up his interest in the company, Debtor began working for BBI and orchestrated its transition from a hotel key card marketing company to a direct-mail sales and printing company similar to SE Print.[82]

At trial, Debtor testified he had a conversation with the Chapter 7 Trustee about his ownership interest in BBI and she did not care.[83] That discussion, if it happened, was not at the section 341 meetings.

**(d) Marital Property**

---

[79] Trial Tr. at 80:7–18.
[80] New Falls' Ex. 2 at 40; "2015 I relinquished my shares, so that's all I know. When we had to file the tax return, I didn't have any shares." Trial Tr. at 102:5–7.
[81] New Falls' Ex. 32 at 2.
[82] As Debtor explained, "And it was at that point in time where I met with [Ms. Brown] and I said BBI is a hotel-marketing company, it's destined to go out of business, it doesn't have any revenue and, I said, your only chance is that we put together a deal and get into the direct mail business using my proprietary knowledge." Trial Tr. at 105:5–12.
[83] Trial Tr. at 224:6–10.

Debtor's Marital Settlement Agreement ("MSA") listed personal property that Debtor did not disclose on his bankruptcy papers.[84]  The MSA was executed in June 2017, about a month and a half after Debtor filed his bankruptcy schedules.  Per the MSA, Debtor's spouse retained the following property that Debtor did not disclose on his bankruptcy papers:

- the "2004 F-250" valued at $6,000;
- "Art" valued at $8,000;
- "Furniture and furnishings in the home" valued at $5,000;
-  a "Flat Bed Trailer" valued at $6,000;
- a "Tractor" valued at $3,500; and
- a "Generator" valued at $1,000.[85]

Debtor explained he had been separated from his wife for five years before their divorce and these were "assets that belonged to my wife … they weren't mine. They were hers."[86]  Debtor noted he "had moved out of that house years before and told my wife, 'You can have everything. I don't want any of this.' So it was wasn't mine. In my eyes, it was not mine."[87]

**(e) Rental Agreements**

Debtor did not disclose the rental agreement for the Hiawatha Property on his bankruptcy papers.[88]  Debtor and Bonnie Brown executed the rental agreement on December 1, 2016, which called for monthly rent of $1,500.[89]  Based on the copies of rent checks submitted by New Falls, Ms. Brown usually paid less: in the two months preceding Debtor's bankruptcy she paid $1,300/month.[90]

When asked about the nondisclosure Debtor noted "[t]here was no money there.  There was no proceeds to me… this was a sister-in-law type deal.  [Ms. Brown] lived in that house for several years paying no rent at all because she couldn't afford it and BBI didn't have any money. … So at

---

[84] New Falls' Ex. 30.
[85] New Falls' Ex. 30 at 3–4.
[86] Trial Tr. at 136:11–13.
[87] Trial Tr. at 139:9–11.
[88] Trial Tr. at 148:6–11.
[89] New Falls' Ex. 28.
[90] New Falls' Ex. 45.

this point in time [December 2016] … we started to collect rent, but all that money went to paying the mortgage, property taxes, insurance, and maintenance.  The house is 50 years old.  So I was paying all the maintenance on that.  So there was not money.  So that's why I omitted it."[91]

Similarly, Debtor did not list the rental agreement for the Richbarn Property he entered with Margaret Pylant for approximately $1,300/month.[92]  It is unclear when this agreement started, or when it ended.[93]  Debtor testified at his section 341 meeting that it was rented when he prepared his papers, but vacant by the time of the meeting.  At trial, Debtor suspected the Richbarn Property was vacant as far back as 2014 or 2015.[94]

**(f) Prior Business Interests**

On question 27 of his SOFA, which asks about prior business interests within four years of filing for bankruptcy, the Debtor only listed SE Print.  However, New Falls identified several other entities Debtor did not disclose.

### (i) Patriot Pizza, LLC

The Debtor previously held a 49% ownership interest in Patriot Pizza, LLC.[95]  In May 2015, the entity sold its stores and administratively dissolved.[96]  Patriot Pizza owned the Domino's Pizza franchises Debtor discussed at his section 341 meeting.

### (ii) Ultimate Lifestyle Marketing, LLC

Debtor previously held an interest in Ultimate Lifestyle Marketing, LLC which administratively dissolved in 2014.[97]

### (iii) Deliver Designs, LLC

---

[91] Trial Tr. at 144:24–145:12.
[92] Trial Tr. 149:24–150:15.
[93] Trial Tr. at 148:12–149:8.
[94] Trial Tr. at 236:8–24.
[95] Trial Tr. at 181:18–20.
[96] New Falls' Ex. 81; Trial Tr. 182:11–13.
[97] Trial Tr. at 184:17–185:22.

Debtor previously held an ownership interest in Deliver Designs, LLC.[98]  Deliver Designs administratively dissolved in 2015.[99]  Debtor acknowledged he did not list his interest on his SOFA because "[i]t became part of Energy Textiles, so there was no reason to list it."[100]  However, Debtor did not disclose Energy Textiles either.  Debtor explained his partner in Deliver Designs, the owner of the infrared textile technology, turned back his interest.[101]  Debtor then formed Energy Textiles with Ms. Wozniak.[102]

**(g) Miscellaneous**

**(i) Call M.D.**

Debtor held a 2.5% interest in Call M.D. as of the petition date.[103]  Debtor did not list his interest on his initial schedules.  Debtor explained Call M.D. was a multilevel marketing company that he invested $35,000 in for 2.5% of the stock.  Debtor testified that he did not know the company was still in business until his Rule 2004 Examination.[104]  He amended his Schedule A/B to list his interest after the fact.[105]

**(ii) Investment Income from Gaylord Properties Group**

On March 3, 2017, Debtor received $1,200 from Brett Gaylord, which he deposited in his personal checking account.[106]  Debtor received ten more checks for the same amount post-petition on a monthly basis.[107]  The money apparently was an investment in a pizza bag liner invention.  Debtor does not own the technology.[108]  His relationship with the business is unclear but was not

---

[98] Trial Tr. at 186:19–21.
[99] New Falls' Ex. 79.
[100] Trial Tr. at 189:2–6.
[101] Trial Tr. at 187:19–23.
[102] Trial Tr. at 187:19–23.
[103] Trial Tr. at 189:7–17.
[104] Trial Tr. at 241:22–25.
[105] Trial Tr. at 190:13–15.
[106] Trial Tr. at 170:1–9.
[107] New Falls' Ex. 46.
[108] Trial Tr. 261:7–9.

disclosed in any of his schedules or at his section 341 meetings. Debtor testified "there's nothing to report. It's an idea. That's it."[109]

### (iii) Promissory Note from Vincent Stona

New Falls identified a promissory note from Debtor's friend Vincent Stona to Debtor for $307,000.[110] At his deposition, Mr. Stona testified that he ran into some financial difficulties in 2010-2011 and had credit card companies pursuing him for money owed.[111] He went to Robert Carr, "who created some type of judgment document that basically said I owed [Debtor] $300,000, which I didn't, but he said that this will keep creditors away from me, and protect me. It had nothing to do with [Debtor], other than that he used [Debtor]'s name."[112] When shown the document at trial, Debtor noted "This is the first time I've ever seen this. …. I've never loaned Vince any money on this at all. … There is no money, this just never happened."[113]

### (iv) Tax Returns

On question 28 of his Schedule A/B Debtor indicated no tax refunds were owed to him.[114] However, in 2018 Debtor amended his 2014 federal individual income tax return. This resulted in changing what was previously a $21,747 tax deficit to a refund of $38,271.[115] New Falls also identified on Debtor's 2016 federal income tax return, filed in 2019, Debtor overpaid his taxes by $3,025 and directed that the overpayment be applied to his 2017 taxes.[116] Debtor insists irrespective of these filings, he did not receive any money and still owes the IRS money.

### **Discussion**

---

[109] Trial Tr. at 286:21–22,
[110] Trial Tr. 177:14, 15, 22–25.
[111] Doc. 75 at 57:2–9.
[112] Doc. 75 at 58:11–15.
[113] Trial Tr. at 177:16–21.
[114] New Falls' Ex. 2 at 9.
[115] Exs. 35, 94; Trial Tr. at 158:1–7.
[116] Trial Tr. at 166:21–167:14.

New Falls seeks denial of Debtor's discharge under five provisions of § 727(a).  As a general proposition, the Court will grant a debtor a discharge unless a plaintiff establishes one of the specific exceptions to discharge found in § 727(a).[117]  The burden must be carried by a preponderance of the evidence,[118] and in evaluating these exceptions Courts recognize that the complete denial of a discharge is a harsh sanction.[119]  Consequently, exceptions to discharge are construed strictly against a plaintiff and liberally in favor of a debtor.[120]

**Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A)**

Pursuant to § 727(a)(4), a court shall grant a debtor a discharge unless the debtor: (1) knowingly and fraudulently; (2) makes a false oath or account in connection with the bankruptcy proceeding.[121]  Courts have also imposed a materiality requirement.[122]  A false oath or account is material "if it relates to the debtor's business transactions or aids in the discovery of his assets."[123]  Omitting or making false statements on bankruptcy papers can constitute a false oath sufficient to trigger denial of discharge under § 727(a)(4)(A).[124]  The fraudulent intent component "requires actual subjective intent, not objective or constructive intent."[125]  Since debtors typically do not testify to their own misconduct, a debtor's fraudulent intent can be established by multiple inaccuracies in a debtor's schedules showing the debtor engaged in a pattern of concealment.[126]

---

[117] *Welch v. Lapace (In re Lapace),* 614 B.R. 911, 915 (Bankr. M.D. Fla. 2020).

[118] *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

[119] *Jones v. DiVenere (In re DiVenere)*, Case No. 3:11-9122-PMG, Adv. No. 3:13-ap-270-PMG, 2014 WL 1883998, at *2 (Bankr. M.D. Fla. May 8, 2014).

[120] *In re Lapace*, 614 B.R. at 915; *White v. White (In re White)*, 568 B.R. 894, 909-910 (Bankr. N.D. Ga. 2017).

[121] 11 U.S.C. § 727(a)(4)(A); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

[122] *In re Leffingwell*, 279 B.R. 328, 348 (Bankr. M.D. Fla. 2002)

[123] *In re Phillips*, 187 B.R. 363, 370 (Bankr. M.D. Fla. 1995).

[124] *In re Chalik*, 748 F.2d at 618; *Musselman v. Malave (In re Malave)*, Case No. 6:18-001355-KSJ, Adv. No. 6:18-ap-00063-KSJ, 2019 WL 259427, *2 (Bankr. M.D. Fla. Jan 17, 2019) (citing *In re Whitehill*, 514 B.R. 687, 692 (Bankr. M.D. Fla. 2014)); *SunTrust v. Mitchell (In re Mitchell)*, 496 B.R. 625, 632 (Bankr. N.D. Fla. 2013); and *Colon v. De La Caridad Molina (In re De La Caridad Molina)*, Case No. 19-40119-KKS, Adv. No 19-04034-KKS, 2020 WL 4001042, at *2 (Bankr. N.D. Fla. June 26, 2020).

[125] *In re Downey*, 242 B.R. 5, 13 (Bankr. D. Idaho 1999).

[126] *In re Mitchell*, 496 B.R. at 640.

New Falls contends that Debtor's discharge should be barred under this provision because he failed to disclose assets and made numerous omissions or false statements on his bankruptcy papers.  Specifically, New Falls cites Debtor's failure to disclose:

- the Trust and its assets:
  - the 2008 BMW, the Truck, the 50% ownership interest in Energy Textiles, and the commission payments from BBI;
- the rental agreements and rental income from the Hiawatha Property and the Richbarn Property;
- the marital assets that went to his wife on their MSA;
- his prior interest in Patriot Pizza, Ultimate Lifestyle Marketing, Deliver Media, and BBI;
- his current interest in Call M.D.;
- the transfer of his 49% interest in BBI within two years of filing for bankruptcy;
- his reduction in liability to the IRS from his post-petition amendment to his 2014 federal individual income tax return and post-petition filing of his 2016 federal individual income tax return;
- the 307,000 promissory note from Vincent Stona; and
- "his pizza bag invention" and related investment income from Brett Gaylord.

As an initial matter, the Court finds Debtor's alleged omissions concerning the promissory note from Vincent Stona to be meritless.  Mr. Stona testified, and Debtor confirmed, that Mr. Stona never actually owed Debtor any money under the note.  Mr. Stona's attorney Robert Carr created the note as a rouse to dissuade creditors from pursuing Mr. Stona when he was having financial problems.  As such, there was no asset to list.

Similarly, Debtor made no false oath or omission concerning what New Falls calls "his" pizza bag invention.  The invention was not his.  Debtor has no rights in the bag or the technology underlying it.  Debtor deposited one pre-petition check he received from Brett Gaylord into his personal checking account which Debtor disclosed the balance of on his schedules.

Notwithstanding the above, Debtor made false oaths and omissions on his sworn bankruptcy schedules.  In addition, these omissions and false statements were material because their disclosure

would have provided creditors and the Chapter 7 Trustee a more complete picture of Debtor's business relationships.[127]

The determinative issue is Debtor's intent.  New Falls asserts the "cumulative, material false oaths" Debtor made establish his fraudulent intent.[128]  New Falls correctly identifies that "a series or pattern of errors or omissions [can have] a cumulative effect giving rise to an inference of an intent to deceive."[129]  But, in determining whether a debtor has the requisite fraudulent intent, a court also should analyze whether the omissions or nondisclosures are "part of a scheme ... to retain assets for [the debtor's] own benefit at the expense of his creditors."[130]

The Court is persuaded from the circumstances of this case that Debtor intended to hide his assets, albeit meager assets, from his creditors and the Chapter 7 Trustee.  Debtor's failure to list the Trust in response to direct questions on his bankruptcy papers is particularly troublesome, as was his failure to identify the transfer of his commission checks and his interest in Energy Textiles into the Trust on direct questioning by the Chapter 7 Trustee.

Debtor's Trust was not designed or used as a trust for Debtor's children.  It was a revocable trust created and designed to shelter Debtor's remaining and future assts.  Indeed, Debtor's asset planning began early (with Mr. Carr's assistance), as the litigation against him continued to multiply.  He faced substantial personal liability because of his failed business ventures and hoped to move smoothly to his next "big deal."  What is truly unfortunate is that the Bankruptcy Code is designed to facilitate such a fresh start for an honest debtor.  If Debtor simply and carefully disclosed his assets and prior businesses he could have discharged the debt he ran up from his unsuccessful business ventures and received his fresh start.  But, he did not.

---

[127] "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Chalik*, 748 F.2d at 618.
[128] Doc. 87 at 34.
[129]*In re Phillips*, 418 B.R. at 461 (quoting *In re Guthrie*, 265 B.R. 253, 263 (Bankr. M.D. Ala. 2001) (citations omitted).
[130] *In re Dupree*, 336 B.R. 520, 529 (Bankr. M.D. Fla. 2005).

As fraudulent intent depends in large part on an assessment of a debtor's credibility, ultimately, this case came down to how credible Debtor and Debtor's testimony was as to his omissions of the Trust, the commission payments, and Energy Textiles (viewed against the backdrop of his more numerous "minor" nondisclosures in the bulleted list above).[131]

Despite Debtor's contention that he "owned" his nondisclosure of the Trust by disclosing it to the Chapter 7 Trustee, Debtor only made a partial and misleading disclosure. At his initial section 341 meeting, Debtor disingenuously referred to the Trust as "my children's trust" despite using its funds for all manner of personal expenses. This same mischaracterization of the Trust was made to the Court at the August 2017 hearing on New Falls' motion to compel, albeit by Debtor's counsel.[132] At Debtor's initial and continued section 341 meetings he was asked about the totality of the Trust's assets on two separate occasions. Rather than "owning" his nondisclosures, Debtor doubled down on them. Each time Debtor only identified the 2008 BMW and the Truck. And each time Debtor failed to reveal the commission payments from BBI and the 50% ownership interest in Energy Textiles– the Trust's more significant assets.

While Debtor testified at trial that he disclosed his interests in Energy Textiles and BBI to the Chapter 7 Trustee at some non-specific time,[133] Debtor apparently only spoke with the Chapter

---

[131] *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994).

[132] "Debtor's counsel: Yes, Your Honor, except that this – my client's adult daughters have a living trust. My client does not. It is entitled the Phillips Family Living Trust.
…
The Court: Was [Debtor] the settlor of the trust? Did – I mean, is [Debtor] the grantor?
Debtor's counsel: I don't believe so, Your Honor …
…
The Court: Right. But so did [Debtor] create the trust?
Debtor's Counsel: Not to my knowledge, Your Honor. I don't have copies of the trust. My understanding is the daughter has – I don't believe there's a good relationship there." Main Case Doc. 75 at 7:2–4, 11–13; 8: 1–6.

[133] "Debtor's counsel: Did you disclose or have a conversation with Beth Ann Scharrer, the Chapter 7 Trustee, about Energy Textiles? Debtor: Yes. Debtor's counsel: Did she care about the company at all? Debtor: No. Debtor's counsel: Did you have a similar conversation with the Chapter 7 Trustee about BBI? Debtor: Yeah. Debtor's counsel: Did she care about your ownership interest or – Debtor: No." Trial Tr. at 224:1–20.

7 Trustee at the section 341 meetings.[134]   A review of the transcripts of these meetings confirms Debtor did not mention Energy Textiles once and never disclosed a prior ownership interest in BBI. As such, the Court does not find Debtor's testimony that he made these disclosures to the Chapter 7 Trustee to be credible.

Debtor's argument that he did not understand the meaning of question 25 of his Schedule A/B concerning trusts is equally unavailing.[135]   Nor is Debtor's quibble that he was not a beneficiary of the Trust within the meaning of question 19 of his SOFA.[136]   Debtor is not an unsophisticated person.  He had Mr. Carr create the Trust for him in the year proceeding his bankruptcy and actively was putting assets into it in the months leading up to his petition date.  In any event, Debtor was represented by counsel in this case and certainly could have asked what the questions meant or if he needed to disclose the Trust.   In addition, the "trust" question on the official bankruptcy schedules is clear and simple.  Debtor's response was simply false.

Despite Debtor's contention that "[he] made some mistakes. [He] tried to correct them.  [He] wasn't trying to hide anything from anybody,"[137] Debtor's actions speak louder than his words.  To date, Debtor still has not bothered to amend his schedules to list the Trust, the commission payments, the Hiawatha Property rental agreement, or to provide an accurate road map of his business ventures.  Section 727(a)(4)(A)'s purpose is "to ensure that sufficient facts are available

---

[134] "Debtor's counsel: Beth Ann Scharrer, your Chapter 7 Trustee, did you inform her of the Trust and the assets in the Trust?
Debtor: When I – the only time I talked to the Trustee was at that meeting and I divulged those assets." Trial Tr. at 253:14–19.
[135] "Debtor's counsel: When you read the words 'trust' or 'future interest in property,' does that make you think of the Trust that you set up for your daughters?
Debtor: No. … I guess I read it that, you know, if you have equitable or future property, I'm like, its's kind of Greek to me.  So I guess I just misread and didn't really understand the question." Trial Tr. at 255:12–20.
[136] "New Falls' counsel: And paragraph 19 states, 'Within 10 years before you filed for bankruptcy did you transfer any property to a self-settled trust, or a similar device, of which you are a beneficiary,' correct?
Debtor: I'm not the beneficiary.  New Falls' counsel: So --.  Debtor: So, no.  New Falls' counsel: It's your testimony that you don't believe that you have a beneficial interest in your [] Trust?  Debtor: No. The word in the document is 'beneficiary.' … So I read that word and I answered the question based upon that word. I wasn't the beneficiary." Trial Tr. at 285:1–14.
[137] Trial Tr. at 269:12–14.

to all interested persons in the administration of the estate without requiring investigations or examinations to determine whether the provided information is correct."[138] In this case, significant resources were expended on fact-checking a less than forthcoming debtor. While New Falls identified a lot of smoke– particularly with respect to Debtor's boat trailer, snorkel, and bicycle New Falls identified at trial– there was also fire. As such, Debtor is not entitled to the shelter of the Bankruptcy Code.[139] The Court will therefore deny his discharge.[140]

**Objection to claimed exemptions**

New Falls raises three objections to Debtor's exemptions. First, New Falls objects to the tenant by the entirety ("TBE") exemption Debtor claimed under § 522(b)(3)(B) as to the Hiawatha Property and the Richbarn Property to the extent Debtor claimed this exemption.[141] Section 522(b)(3)(B) enables debtors to exempt from the bankruptcy estate "any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety…."[142] In this case, Debtor was married on the date he filed his bankruptcy petition and

---

[138] *In re Mitchell*, 496 B.R. at 631 (citing *In re Ingersoll*, 124 B.R. 116, 122 (Bankr. M.D. Fla. 1991)).

[139] Section 727(a)(4) operates to deny "the shelter of the bankruptcy code" to debtors who "play fast and loose with their assets or with the reality of their affairs." *In re Sadler*, 282 B.R. 254, 264 (Bankr. M.D. Fla. 2002).

[140] Because the Court denied Debtor's discharge under 11 U.S.C. § 727 (a)(4)(A), it is unnecessary to address New Falls' alternative counts seeking a denial of the same discharge. *See Protos v. Silver (In re Protos)*, 322 F. App'x 930, 932-33 (11th Cir. 2008) ("A finding against the [debtor] under any single subsection of section 727 is sufficient to deny him a discharge.").

[141] As an aside, New Falls' objection is largely academic. It is unclear Debtor's TBE exemption had any effect of shielding the Hiawatha Property or the Richbarn Property from creditors in the first instance. There appear to have been ample joint creditors of Debtor and his wife as of the petition date, including New Falls, Debtor's largest creditor. Therefore, from the outset the properties were available to administer for the benefit of the estate had the Chapter 7 Trustee wished to do so. However, knowing both properties were underwater and after being apprised of the post-petition rents the properties generated over expenses and that the Richbarn Property was no longer rented, she abandoned them. The Court finds no reason to second guess the business judgment of the Chapter 7 Trustee, nor did New Falls offer any basis to do so.

[142] 11 U.S.C. § 522(b)(3)(B).

thus was entitled to assert the TBE exemption to the extent of non-joint obligations.[143]  However, about three-and-a-half months after filing his petition, Debtor and his wife divorced.[144]

New Falls contends Debtor's divorce, which occurred within 180 days of his petition date, terminated his TBE exemption and brought his after-acquired interests in the Richbarn Property and the Hiawatha Property into his bankruptcy estate pursuant to § 541(a)(5)(B).  Section 541(a)(5)(B) provides that the bankruptcy estate includes:

> Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date … as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree.[145]

While the intersection of § 541(a)(5)(B) and § 522(b)(3)(B) is not a well-trod area and New Falls offers no case law in support of its argument, the Fourth Circuit Court of Appeals has addressed the issue and held the post-petition entry of a "divorce decree within 180 days of the filing of the bankruptcy petition renders the section 522(b)[3](B) exemption inapplicable."[146]  The Court finds the Fourth Circuit decision well-reasoned,[147] and absent contrary authority in this Circuit, will sustain New Falls' objection to Debtor's § 522(b)(3)(B) exemption as to the Hiawatha Property and the Richbarn Property.

---

[143] Under Florida law "[W]hen property is held as a tenancy by the entireties, only the creditors of both [spouses], jointly, may attach (sic) the tenancy by the entireties property; the property is not divisible on behalf of one spouse alone, and, therefore, it cannot be reached to satisfy the obligation of only one spouse." *In re Sinnreich*, 391 F.3d 1295, 1297 (11th Cir. 2004) (quoting *Beal Bank, SSB v. Almand and Associates*, 780 So. 2d 45, 53 (Fla. 2001).

[144] The Court notes except for certain statutory exceptions, property of the estate and exemptions are determined on the date the bankruptcy petition is filed.  *Owen v. Owen*, 500 U.S. 305, 314 n. 6, 111 S.Ct. 1833, 1838 n. 6, 114 L.Ed.2d 350 (1991).

[145] 11 U.S.C. § 541(a)(5)(B).

[146] *In re Cordova*, 73 F.3d 38, 41 (4th Cir. 1996).  At the time of the *Cordova* court's decision, § 522(b)(3)(B) was labeled as § 522(b)(2)(B).

[147] In so holding, the Court observed, "the divorce decree terminating co-ownership of the home released [debtor] from the unique features of the tenancy by the entirety.  Once those features were extinguished, so, too, was the rationale for exempting [debtor's] fee simple interest from the bankruptcy estate." *In re Cordova*, 73 F.3d 38 at 41.

Though the Court will sustain New Falls' objection, the Court notes New Falls did not address the disposition of the Hiawatha Property or the Richbarn Property as a result of Debtor's MSA/divorce or offer any basis to conclude the new interests Debtor possesses in the properties are of consequential value to the estate (i.e. if there are post-petition rents above expenses available for turnover).[148]

New Falls' two other objections lack merit and can be addressed expeditiously. New Falls objects to Debtor's personal property exemptions "to the extent that the actual value of said property caused the Debtor to exceed the available $1,000 per person personal property exemption and the $1,000 per person vehicle exemption … which would include any undisclosed assets." In this case, Debtor applied his $1,000 personal property exemption to the 50 hp engine on the 2004 Sundance boat, which he valued at $2,000. New Falls makes no argument that half of the engine is worth more than $1,000. In addition, Debtor did not claim a vehicle exemption and did not receive a personal property exemption as to the balance of his checking account, utility prepayment, or the other $775 in personal and household goods he scheduled on his Schedule C. Lastly, New Falls objects to Debtor's claimed exemptions in the personal property on his Schedule C to the extent it was transferred to the Trust. But none of the property on Debtor's Schedule C is alleged to have been transferred to the Trust. In any event, the Trust itself was property of the estate. As such, the Court will overrule New Falls' objections to Debtor's claimed exemptions.

**Turnover of Property of the Estate**

New Falls' final claim seeks turnover of the Trust and "all of the property transferred into it, together with all non-exempt property …"[149] This section requires turnover of property "to the

---

[148] In the Court's review of the MSA, it appears Debtor's entireties interest in the Hiawatha Property changed to a fee simple interest while Debtor's entireties interest in the Richbarn Property became some kind of "50%" interest with an obligation to pay the property's mortgage.
[149] Doc. 87 at 41.

trustee" and does not authorize turnover to a creditor.[150]   The Court will deny New Falls' request for turnover, without prejudice to the Chapter 7 Trustee seeking turnover from the Debtor of any asset described herein which she determines may have consequential value to the estate, including the Hiawatha Property, the Richbarn Property, or proceeds from the rents of the properties.

For these reasons, it is

**ORDERED**:

1.    Debtor is denied a discharge under 11 U.S.C. § 727(a)(4)(A).

2.    New Falls' objection to Debtor's § 522(b)(3)(B) exemption is sustained.  New Falls' objections to Debtor's other exemptions are overruled.

3.    New Falls' request for turnover is denied, without prejudice.

4.    A separate judgment consistent with this ruling will be entered.

---

[150] 11 U.S.C. § 542(a).